*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0455P (6th Cir.)
File Name: 03a0455p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

JOAN MARIE ANDERSON
(02-1662); FRANCIS ALBERT
SAGORSKI (02-1673); RODGER
BRUCE YATES (02-1700);
ARTHUR HENRY
MODDERMAN (02-1703);
SUSAN ELAINE SLOBODA
(02-1736); ROBERT LEE
GOODWIN, JR. (02-1769);
RUTH ELAINE SHRIVER
(02-1771),
  *Defendants-Appellants.*

Nos. 02-1662/
1673/1700/1703/
1736/1769/1771

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 01-00175—Robert Holmes Bell, Chief District Judge.

Argued and Submitted: December 2, 2003

Decided and Filed: December 23, 2003

---

Before: GUY and GILMAN, Circuit Judges; REEVES,
District Judge.*

———————————

**COUNSEL**

**ARGUED:** Lawrence J. Phelan, HAEHNEL & PHELAN, Grand Rapids, Michigan, Kevin M. Schad, SCHAD & COOK, Indian Springs, Ohio, Richard E. Zambon, MITCHELL & ZAMBON, Grand Rapids, Michigan, Daniel R. Fagan, DANIEL R. FAGAN & ASSOCIATES, Grand Rapids, Michigan, John M. Karafa, Grand Haven, Michigan, for Appellants. Donald A. Davis, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Lawrence J. Phelan, HAEHNEL & PHELAN, Grand Rapids, Michigan, Kevin M. Schad, SCHAD & COOK, Indian Springs, Ohio, Richard E. Zambon, MITCHELL & ZAMBON, Grand Rapids, Michigan, Daniel R. Fagan, DANIEL R. FAGAN & ASSOCIATES, Grand Rapids, Michigan, John M. Karafa, Grand Haven, Michigan, Anthony J. Valentine, TWOHEY MAGGINI, PLC, Grand Rapids, Michigan, Keith W. Turpel, Kalamazoo, Michigan, for Appellants. Donald A. Davis, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

———————————

**OPINION**

———————————

PER CURIAM. These seven consolidated appeals by defendants Joan Marie Anderson, Arthur Henry Modderman,

---

*The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Rodger Bruce Yates, Francis Albert Sagorski, Ruth Elaine Shriver, Susan Elaine Sloboda, and Robert Lee Goodwin, Jr., raise various challenges to their respective convictions and/or sentences. The 73-count Superceding Indictment in this case charged 14 defendants with conspiracy both to defraud and to commit offenses against the United States in violation of 18 U.S.C. § 371 (count 1); substantive offenses relating to the making and offering of fictitious "sight drafts" purporting to be actual financial instruments issued under the authority of the United States in violation of 18 U.S.C. § 514(a)(2) (counts 2-24); and substantive offenses involving the making and subscribing, or aiding, assisting or counseling the making and subscribing of false reports of cash transactions to the IRS on Form 8300 in violation of 26 U.S.C. § 7206(1) and (2) (counts 25-73). Two defendants pleaded guilty and the remaining twelve defendants were convicted by a jury on all charges following a joint trial. After review of the record and the defendants' respective challenges to their convictions and/or sentences, we affirm in all respects.

## I.

The indictment alleged that beginning in late 1998 and continuing through July 2001, the defendants joined in a single conspiracy with multiple objectives: namely, to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions of the IRS and other federal agencies; and to commit offenses against the United States with respect to both the fictitious sight drafts and the false reports of cash transactions to the IRS.[1] The indictment described the "means and methods" of the

---

[1] A bank representative, Paul Wegener, contrasted a check with a sight draft. A check is payable on demand when presented to a bank, while the maker or drawer of a sight draft instructs the drawee to pay a third party. A sight draft is not deposited in an account like a check, but must be processed through the collection department.

conspiracy to include the creation and offering of 193 fictitious sight drafts purporting to be drawn on the United States Treasury with an aggregate face value of more than $550 million and the use of IRS Form 8300 to falsely report that 113 transactions occurred with third parties with an aggregate value of more than $490 million. In addition, defendants refused to appear before or cooperate with the grand jury, its subpoenas, or the federal district court. Defendants also filed frivolous "notices" (including criminal complaints) against prosecutors, law enforcement and judicial officers involved in the investigation and prosecution of this case.

In 1998, defendant Rodger Yates was serving a sentence in federal prison for activities involving the "Montana Freemen" at the same time that defendant Jerry Allen Chase was serving a sentence for violating income tax laws. Chase testified that Yates told him that he and Roger Elvick were perfecting a scheme using false financial instruments that appeared to be drawn on the United States. Yates enlisted the aid of individuals outside prison; namely, Joan Anderson, her common law husband Arthur Modderman, and Phillip Leroy (a.k.a. PJ) Hammond (who has not appealed). Yates, who was in prison for having used earlier forms of fictitious instruments, told Chase that the new "sight draft" theory was "more sound" than earlier schemes.

During that same time frame, defendants Ruth Shriver (Shriver) and her husband Jack Shriver (who has not appealed) were in financial trouble with the IRS. The Shrivers communicated with Elvick and his partner, Roger Knutt, both of whom had recently been released from prison and claimed to have recovered their farm using false sight drafts. In late summer 1998, PJ Hammond ordered thousands of blank sight drafts from a commercial printing company. The drafts were paid for by someone named "Ruth." On September 9, 1998, the Shrivers sent the IRS a sight draft appearing to be drawn on the United States Treasury in the

amount of $1.75 million. Although the IRS initially credited the Shrivers in that amount, the credit was reversed. Within a week of the first sight draft, six other codefendants each wrote similar sight drafts to the IRS (including appellants Sagorski, Hammond, Anderson, and Modderman).

Sight drafts made payable to the IRS were written by all but two defendants, Sloboda and Goodwin, and formed the basis for the substantive charges in counts 2 through 24. As referenced earlier, numerous other sight drafts were presented to state and local governments, credit card companies, banks and credit unions, brokerages, and were also used for personal expenses. Part of the scheme was the hope that some financial institutions had such sloppy computer systems that at least some sight drafts would be accepted and the credits could be spent or used to eliminate other debts.

Another aspect of the conspiracy involved the filing of false returns with the IRS that reported cash transactions of over $10,000, when no transaction had in fact occurred, in order to intimidate and harass the individual identified as having participated in the nonexistent transaction. Under federal law, a return, Form 8300, must be filed with the IRS when a person engaged in a trade or business receives over $10,000 in a cash transaction. 26 U.S.C. § 6050I. Form 8300 includes a jurat, stating that: "Under penalties of perjury, I declare that to the best of my knowledge the information I have furnished above is true, correct, and complete."

Targets of the false 8300s included individuals who rejected sight drafts and both public officials and private individuals against whom a defendant bore a grievance. For example, four members of the Westveld family were targeted because one of them had purchased property that had once

belonged to Modderman.[2] Most of the false 8300s reported nonexistent transactions involving a number of judges, prosecutors, attorneys, public officials, and law enforcement and corrections officers. The forms were filled out to indicate that the target had refused to give his or her social security number, which automatically caused the IRS to send a stern form letter to the target demanding compliance with the law.

A total of eight defendants were charged with making false declarations under penalty of perjury by signing a false IRS Form 8300, in violation of § 7206(1); including appellants Modderman (counts 37-45), Sagorski (counts 46-47), Sloboda (counts 48-49), and Goodwin (counts 28-30). The remaining charges for aiding, assisting, counseling, or advising others to make false declarations on the 8300s in violation of § 7206(2) were brought against Yates (counts 50-53) and Anderson (counts 50-73).

The evidence showed that Anderson and Modderman explained the "redemption theory" and instructed others how to write the sight drafts and fill out the false 8300s. One witness, Diana Arndt-Mammen (Arndt), testified that Anderson and Modderman offered the sight-draft scheme as a way for her to resolve her severe financial problems, showed her how to fill out the sight drafts and false 8300s, and asked if she had filed false 8300s against those who rejected the sight drafts. Another coconspirator, Herbert Lawrence, testified that Anderson and Modderman instructed him on how to use the false 8300s to "bring the IRS down" on officials and other individuals to harass them. Anderson and Modderman also told Lawrence to avoid lawyers, that he did

---

[2] An employee of a credit union was targeted by Hammond, and a disabled worker in the mailroom of a credit card company was targeted after opening an application from defendant Carney.

not have to obey the corrupt court system, and that he would be protected if he recited their "shield" or "mantra."[3]

Use of the mantra was taught as part of the scheme and was recited by various defendants through all stages of the proceedings. It was part of the refusal to cooperate with the grand jury and in contempt proceedings, which resulted in obstruction of justice enhancements at sentencing. Handwriting exemplars were ultimately provided to the grand jury, but not until after defendants were held in contempt of court. At trial, each of the defendants—except for Sagorski, Dewey Metcalf, Sr., and Dewey Metcalf, Jr.—disrupted the trial by standing and reciting the mantra.

This disruption involved several defendants rising together, repeatedly reciting the mantra and being removed from the courtroom. The first time, seven defendants were removed. The next day, a total of nine defendants were removed.[4] With that, the district court decided, after consulting with counsel, that the nine defendants would be allowed to return only if they gave assurances that they would not disrupt the proceedings any further. Unwilling to give any assurances, none of the nine were present in the courtroom for the rest of the trial. Although the defendants do not challenge the district court's handling of the situation, it was the basis for upward departures at sentencing as well as Sagorski's motion for severance or mistrial.

Defendants were convicted on all counts and, after sentencing, timely notices of appeal were filed on behalf of

---

[3] The mantra consisted of the following three questions and demand: "What is your name? Do you have a claim against me? Do you know of any others that have a claim against me? I request the order of the Court be released to me immediately."

[4] Ruth Shriver also rose and stepped toward someone near the podium, but was intercepted by security and removed from the courtroom.

Anderson, Modderman, Yates, Sagorski, Sloboda, Goodwin and Shriver.

## II.

With the exception of Sloboda and Shriver, defendants appeal from the denial of judgment of acquittal with respect to some or all of their convictions. On appeal, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard applies to both direct and circumstantial evidence, and all reasonable inferences must be drawn in favor of the government. *United States v. Searan*, 259 F.3d 434, 441 (6th Cir. 2001).

### A. Form 8300

Challenging their convictions for violations of 26 U.S.C. § 7206(1) and (2), as well as the portion of the conspiracy charge relating to these offenses, Anderson, Yates, Modderman, Sagorski, and Goodwin argue first that these convictions must be reversed because there is no duty to file Form 8300 for nonexistent transactions. Defendants reason that if there is no duty to file a return, there can be no prosecution for filing a form containing false information either because it cannot be a "willful" violation or because the falsity cannot be "material." While there are apparently no cases addressing this argument, we are satisfied that it is the novelty of the defendants' conduct that accounts for this fact and not the inapplicability of § 7206 to this situation.

Defendants emphasize that most cases involving the currency transaction report required by 26 U.S.C. § 6050I are prosecutions for willful failure to file the return under 26 U.S.C. § 7203. That may be, and, in those cases, proof of a duty to file a return may be required for conviction since

§ 7203 refers to any person "required to make a return." We have no difficulty concluding, however, that proof of a duty to file a return is not required to establish a violation of § 7206(1) or (2) for filing reports of nonexistent transactions. *See United States v. Tarwater*, 308 F.3d 494, 504 (6th Cir. 2002) (describing § 7206 as a perjury statute criminalizing lying on any document filed with the IRS).

"Willfulness" for purposes of the tax laws connotes "'a voluntary, intentional violation of a known legal duty.'" *Cheek v. United States*, 498 U.S. 192, 200 (1991) (citation omitted). The relevant duty for purposes of willfulness is the duty imposed by the provision of the statute or regulation the defendant is accused of violating. *Id.* at 201-02. Under § 7206(1), the government must show the defendant willfully made and subscribed "any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter." The companion section, § 7206(2), makes it a felony for any person to willfully aid, assist, procure, counsel, or advise the preparation or presentation under the internal revenue laws a return, affidavit, claim or other document which is fraudulent or false as to any material matter. The clear import of these provisions is that when one makes and subscribes a return, or aids and counsels the preparation and presentation of a return, an obligation arises that the return not be false as to any material matter. This duty arises with the making of the return, without regard to whether there was an obligation to file one in the first place.[5]

---

Taking a slightly different tack, Modderman argues that the falsity of the information on the 8300s was not "material" because in the absence of any reportable transaction there was no duty to file the 8300s and no tax to be computed by the IRS. Of course, the failure to report income or other items necessary to the computation of tax is material. *Tarwater*, 308 F.3d at 505. In general, however, "a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Neder v. United States*, 527 U.S. 1, 16 (1999) (alteration in original) (citation omitted). We reject defendants' contention that it is immaterial as a matter of law to falsely report a transaction on Form 8300 when no transaction has in fact occurred.

**B. Sight Drafts**

The convictions for violation of 18 U.S.C. § 514(a)(2), as well as the portion of the conspiracy charge relating to those offenses, are challenged on appeal by Modderman (counts 1, 15-17), Yates (counts 1 and 24), Sagorski (counts 1, 18-22), and Goodwin (count 1).[6] Defendants make three main claims: that the sight drafts are not "fictitious" obligations; that they do not appear to be "actual" financial instruments; and that there was no evidence of an intent to defraud because they did not attempt to get a refund from the IRS. None of these claims have merit.

Added in 1996, § 514(a)(2) makes it a felony to pass, present, offer, issue, attempt or cause the same, or possess, with intent to defraud,

---

[5] Although Anderson claims error in the failure to give a requested instruction on willfulness, the record shows that the jury was instructed concerning "willfulness." The district court denied a request that "willfully" be added to the verdict form.

[6] Anderson does not appeal her convictions for violation of § 514(a)(2) (counts 2-3), or her conviction on the conspiracy charge (count 1).

any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other financial instrument issued under the authority of the United States, a foreign government, a State or other political subdivision of the United States, or an organization[.]

The legislative history of this provision indicates that it was intended to cover "fictitious" instruments, as opposed to "counterfeit" instruments, in order to close a loophole in the criminal statutes. *United States v. Howick*, 263 F.3d 1056, 1066-67 (9th Cir. 2001), *cert. denied*, 535 U.S. 946 (2002). The court in *Howick* articulated the distinction between counterfeit and fictitious documents as follows, *id*. at 1067:

> A "counterfeit" obligation is a bogus document contrived to appear similar to an existing financial instrument; a "fictitious" obligation is a bogus document contrived to appear to be a financial instrument, where there is in fact no such genuine instrument, and where the fact of the genuine instrument's nonexistence is presumably unknown by, and not revealed to, the intended recipient of the document.

In this case, there was testimony that although there is a legitimate financial instrument known as a sight draft, the United States Treasury has not used sight drafts in modern history. Moreover, the United States Treasury maintains no depository accounts against which an individual could draw a check, draft, or any other financial instrument. The sight drafts at issue here were properly charged as fictitious instruments under § 514(a)(2).

Yates asserts, without elaboration or citation to authority, that it was obvious from the face of the sight draft that it was not an "actual" financial instrument within the meaning of § 514(a)(2). While the sight drafts were not in fact accepted

by any of the recipients, we agree with the court in *Howick* that because the "very purpose of the statute is to supplement the preexisting counterfeit laws by criminalizing bogus obligations that are not copies of any *actual* obligation" the term "actual" in § 514(a)(2) cannot be given its most natural meaning. 263 F.3d at 1067 (emphasis in original). Instead, it should be interpreted to encompass the idea of "verisimilitude"—the quality of appearing to be true or real. *Id*.[7]

Recognizing the infinite range of financial instruments, both genuine and fictitious, the court in *Howick* interpreted the phrase "'actual security or other financial instrument'" to mean "one that appears to be 'actual' in the sense that it bears a family resemblance to genuine financial instruments" or, in other words, "include[s] enough of the various hallmarks and indicia of financial obligations so as to appear to be within that class." 263 F.3d at 1068. In this case, the government presented testimony from William Kerr of the Office of the Comptroller describing the sight drafts as having good physical quality (including microencoding, microprinting, a colored background, and an artificial watermark), and noting that their invalidity would not necessarily be apparent just from looking at them.

Finally, defendants assert that there was insufficient evidence of an intent to defraud because they made no attempt to obtain a refund from the IRS. As the government points out, however, it was not necessary to prove defendants requested a refund in order to establish that the sight drafts were presented with intent to defraud. Intent may be proven through circumstantial evidence, and there was evidence from

---

[7]In contrast with counterfeit statutes, § 514(a)(2) cannot be interpreted to include a "similitude" requirement; that is, that the document bear such likeness to genuine currency as is calculated to deceive an honest unsuspecting person of ordinary observation.

which the jury could infer that defendants knowingly sent worthless sight drafts drawn on the United States Treasury with the intention that they be accepted for value.

## C. Sufficiency

Defendants Goodwin and Sagorski argue that the evidence was insufficient to support their convictions under 26 U.S.C. § 7206(1) (counts 28-30 and 46-47). Sagorski specifically relies on the fact that the document examiner was unable to identify him as having signed the 8300s that bore his name. The witness did testify, however, that Sagorski authored all other entries on the form and that no conclusion could be made about the signatures because Sagorski's handwriting exemplar was "very quickly executed and partially illegible." Goodwin, on the other hand, relies on the fact that the document examiner could only identify him as the "probable preparer" of the 8300s bearing his name.

In addition to the expert witness testimony, the jury was entitled to consider both circumstantial evidence as well as the rebuttable presumption afforded by 26 U.S.C. § 6064, which provides that the fact that an individual's name is signed to the return is *prima facie* evidence that the return was signed by him. We have no difficulty finding that when the evidence and inferences are viewed in the light most favorable to the prosecution, there was sufficient evidence from which a rational trier of fact could conclude that Sagorski and Goodwin signed the false 8300s that bore their names.

Next, defendants Sagorski and Goodwin challenge the sufficiency of the evidence tying them to the charged conspiracy. Both defendants argue first that they never joined the conspiracy to defraud the United States by obstructing the IRS. Not only does this ignore that the conspiracy had multiple objectives, but also disregards the evidence concerning their participation. Goodwin's name was signed

on 11 false 8300s directed at judicial officers, police, and attorneys that collectively reported over $140 million in financial transactions which never occurred. Goodwin also refused to cooperate with the grand jury, sent notices to court officers, and joined with those who acted to disrupt the trial.

Sagorski signed 34 false sight drafts totaling $49 million and filed 16 false 8300s reporting nonexistent transactions with employees of financial institutions, as well as judges, lawyers, and court officers. Special Agent Robert Walker testified that Sagorski admitted to having prepared the 8300s and sight drafts bearing his name and insisted that the IRS was a fictitious entity with no right to collect taxes. In addition, Sagorski was responsible for bringing Lawrence and Arndt into the conspiracy.[8]

Finally, Goodwin argues that it was error to have admitted another piece of evidence, the only sight draft purportedly written by him, because it preceded the conspiracy. To the contrary, the sight draft was dated May 21, 1999, and was endorsed on the reverse side to Jerry M. Beurkens on July 13, 1999; well within the period of the conspiracy. Beurkens, a city attorney, testified that he had prosecuted Goodwin on a traffic ticket several years earlier; received several documents

---

[8] Sagorski, a customer in Lawrence's muffler shop, heard Lawrence's anger at police and the court system and arranged for him to meet with Anderson and Modderman at their home. Sagorski also gave Lawrence some audio tapes that included anti-government rhetoric. Under Anderson's direction, Lawrence signed false 8300s that were filed with the IRS reporting transactions with individuals against whom Lawrence bore grievances. Arndt, who worked for Sagorski, had severe financial problems arising from her son's use of her credit cards. Sagorski referred her to Anderson and Modderman and provided her with sight drafts on one occasion. Arndt sent more than 50 sight drafts and filed false 8300s. She introduced her son and sister to the scheme and they, in turn, also wrote worthless sight drafts.

from Goodwin, including the sight draft; and was the target of a false Form 8300 filed with the IRS.[9]

### III.

Sagorski claims error in the denial of his motion for severance or mistrial on the grounds that he was prejudiced by the disruptive behavior of his codefendants. Whether properly articulated as a question of prejudicial joinder requiring severance, or a motion for mistrial resulting from prejudicial joinder, the record reflects that the district court addressed the appropriate considerations for determining whether the defendant could demonstrate he was prejudiced. *See United States v. Moore*, 917 F.2d 215, 220 (6th Cir. 1990). Our review of a district court's decision on a motion for severance or for mistrial is for abuse of discretion. *United States v. Lloyd*, 10 F.3d 1197, 1215 (6th Cir. 1993) (prejudicial joinder); *United States v. Chambers*, 944 F.2d 1253, 1263 (6th Cir. 1991) (mistrial).[10]

Relief from prejudicial joinder is required "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). A trial court's limiting instructions may "cure" such prejudice. *Id*. The defendant bears the burden of making a "strong showing of factually specific and compelling prejudice resulting from a

---

[9]Goodwin also argues that this sight draft was neither the subject of a substantive charge nor listed as an overt act in furtherance of the conspiracy. The government may offer proof of overt acts not listed in the indictment. *United States v. Henson*, 848 F.2d 1374 (6th Cir. 1988). The government also notes that this exhibit was admitted twice without objection from Goodwin.

[10]At trial, counsel for Sagorski agreed with the district court's characterization that the motion was in essence one for mistrial.

joint trial." *Moore*, 917 F.2d at 221. We adhere to the view that the jury must be presumed capable of sorting out the evidence against each defendant separately. *Id*. at 220.

In denying Sagorski's motion, the district court observed at the outset that there had been a noticeable difference in the appearance, demeanor, and attentiveness of the three defendants who did not disrupt the proceedings (who were also on bond) as compared to the nine defendants who engaged in the disruptive behavior. The three nondisruptive defendants were also physically separated from the others, due to the configuration of the tables in the small courtroom. In addition, the court noted that much of the evidence related to the sight drafts or 8300s allegedly prepared by the various individuals.

Finally, in considering the impact of the disruptive behavior, the court indicated that the outbursts were short and the defendants were quickly escorted out of the courtroom. In fact, the court suggested that Sagorski's good behavior may have served to impress the jury and differentiate him from the disruptive defendants. No further disruptions occurred, as the nine defendants were unwilling to give the necessary assurances. Moreover, the jury was properly instructed to separately consider the evidence as to each defendant. *United States v. Stull*, 743 F.2d 439, 447 (6th Cir. 1984). We find no abuse of discretion in the denial of Sagorski's motion for severance or mistrial.

### IV.

Several evidentiary claims are raised by defendants Anderson, Modderman, Sagorski, and Goodwin. We review the district court's decisions concerning the admission of evidence for abuse of discretion. *United States v. Middleton*, 246 F.3d 825, 836 (6th Cir. 2001). Even if an abuse of discretion has occurred, "[a]ny error, defect, irregularity, or

variance that does not affect substantial rights must be disregarded." FED. R. CRIM. P. 52(a).

Anderson, joined by Modderman, claims error occurred when Agent Jon Street was allowed to testify concerning a box of documents which consisted of correspondence received from the defendants and addressed to individuals including judges, prosecutors, and IRS investigators (the "Gateway" box). The essence of Anderson's claim on appeal is twofold: that it was an abuse of discretion to allow testimony concerning the entire collection of documents without admitting all of the documents; and that it was unfairly prejudicial because it allowed the jury to speculate about the voluminous "collective misdeeds" of the defendants. We reject these contentions as meritless.

The record reflects that Street testified generally concerning the contents of the box to explain how the documents were accumulated and organized, but did not include specifics about documents that were not admitted into evidence. In addition, the box was present so that it would be available for defense counsel to use in cross-examination. From the box, Street selected documents sent by various defendants that contained the same or very similar captions or verbiage. Those selected documents were offered as exhibits to show the existence of and participation in the conspiracy. To the extent that the voluminous number of documents reflected badly on defendants, it was not unfairly prejudicial. There was no claim that the box did not contain the kind of documents that the exhibits represented. At least one defendant was able to clarify on cross-examination that none of the selected documents were sent by him.

Anderson and Modderman contend that it was an improper plea for sympathy to mention that defendants directed notices and other harassing correspondence to the prosecutor personally. In overruling objections to such evidence, the district court observed that to exclude the evidence would

allow a defendant to thwart prosecution by sending damaging material to the prosecutor. This is an unusual case in that the letters and notices were relevant to the conspiracy charge and were not themselves of an inflammatory nature. Moreover, defendants have not identified any questioning or argument by the prosecutor relating to the correspondence that would tend to inflame the jury.[11]

Sagorski claims that the district court erred in allowing Agent Steven Baker to testify concerning items seized from the Anderson-Modderman residence. Specifically, defendant points to testimony about a letter from a bank in response to correspondence from Sagorski; a copy of the alert from the Comptroller's Office to financial institutions about the fictitious sight drafts; excerpts from a book called "Accepted for Value"; portions of pamphlets outlining the use of the mantra; and literature referencing the "Kingdom of Heaven" group and other teachings. Defendant argues that the evidence was hearsay, and claims it was irrelevant and highly prejudicial because it branded the defendants as "anti-government" and because some of the references might have called to mind similarly named cults. There is no indication, however, that an objection was made on either basis. As such, our review is for plain error. *United States v. Thomas*, 11 F.3d 620, 629-30 (6th Cir. 1993).

This evidence was relevant to the question of the defendants' knowledge and intent and would not have been offered for the truth of the matter asserted. Moreover, this was hardly the only evidence of "anti-government" sentiment

---

[11]In a related argument, Goodwin asserts that documents received by the government during trial, including a letter prepared by Goodwin from the holding cell and handed to a Deputy United States Marshal, were irrelevant, outside the scope of the conspiracy, and unduly prejudicial. The documents, and especially Goodwin's letter, were relevant to the alleged conspiracy as they supported the contention that there was concerted action by the defendants.

on the part of the defendants. Finally, it would be pure speculation to conclude that references to the "Kingdom of Heaven" group might have led the jurors to associate defendants, specifically Anderson and Modderman, with a cult known by a similar name. We find no reversible error.

## V.

Five defendants—Anderson, Shriver, Sloboda, Goodwin, and Sagorski—appeal from certain aspects of the district court's calculation of their adjusted offense level under United States Sentencing Guidelines Manual (USSG) § 2F1.1 (2000). This guideline applies to both the group of offenses relating to the sight drafts and those relating to the false 8300s, and provides for a base offense level of 6. USSG § 2F1.1(a). The guideline applicable to the conspiracy charge, USSG § 2X1.1(a), incorporates this base offense level and any specific offense characteristics for intended conduct that can be established with reasonable certainty. Because a broad range of offenses are covered by USSG § 2F1.1, the guidelines include a number of specific offense characteristics – the most significant of which is the incremental increase of up to 18 levels based on the value of the loss or intended loss. USSG § 2F1.1(b)(1).[12]

Although the probation department recommended that the offense level be increased based on the face value of all the sight drafts and 8300s attributable to each defendant, the district court rejected that approach as inconsistent with this court's precedent concerning the calculation of intended losses. *United States v. Watkins*, 994 F.2d 1194 (6th Cir. 1993); *United States v. Khan*, 969 F.2d 218 (6th Cir. 1992).

---

[12]USSG § 2F1.1 was repealed and amended provisions were consolidated in USSG § 2B1.1, effective November 1, 2001. *See* USSG § App. C, amendment 617. Although defendants were sentenced after the effective date, the old provision was used in order to avoid *ex post facto* problems.

This determination is not challenged on appeal. To be included as an intended loss, the district court must find the defendant intended the loss; it was possible for the defendant to cause the loss; and the defendant completed or was about to complete, but for interruption, all of the acts necessary to bring about the loss. *Watkins*, 994 F.2d at 1196.

Consequently, the district court categorically excluded the value of all the 8300s, leaving a base offense level of 6 for the § 7206 offenses. The court then discriminated between sight drafts that would be counted as intended losses, excluding those for more than $100,000 and including those that related to an existing debt or an attempt to obtain credit. In this way, the district court determined that Anderson and Sagorski would each receive a 12-level increase in the offense level relating to their convictions under § 514(a)(2) for intended losses of more than $1.5 million and less than $2.5 million under § 2F1.1(b)(1)(M). Anderson and Sagorski claim that this was error.

### A. Intended Loss and § 514(a)(2) Offenses

At the outset, Anderson argues that no sight drafts should have been included as intended losses because they were so obviously bogus that it was impossible for the scheme to succeed in causing a loss. In *Khan*, we explained that the incremental increases for intended losses "assume a fraudulent scheme that would have created some actual loss but for the interruption of the scheme by detection or failure to carry out all the steps necessary to succeed." 969 F.2d at 221. This limitation applies when the impossibility of pecuniary loss is "entirely unrelated to the fraud or its discovery." *Id.* at 220. *See United States v. Ly*, No. 98-3783, 1999 WL 196573 (6th Cir. Mar. 29, 1999) (unpublished

decision). While no sight drafts were accepted for value in this case, it is because the fraud was detected.[13]

Anderson and Sagorski both claim the district court erred by holding them accountable for sight drafts written by others. To be considered "relevant conduct," the conduct must have been (1) reasonably foreseeable to the defendant and (2) undertaken in furtherance of the jointly undertaken criminal activity. USSG § 1B1.3(a)(1)(B) and comment. (n.2) (2000); *United States v. Orlando*, 281 F.3d 586, 600 (6th Cir.), *cert. denied*, 537 U.S. 947 (2002). The district court must make individualized findings regarding these requirements in order to differentiate between coconspirators. 281 F.3d at 600.

Sagorski does not contest the amount of losses representing sight drafts he wrote himself, to the tune of about $820,000, but only disputes the inclusion of sight drafts written by Arndt and her son, Chad Boerma, on the grounds that the court failed to make particularized findings concerning the foreseeability of their conduct and the scope of the joint activity. The record shows, however, that the district court made the requisite findings.[14]

The district court found that Sagorski recommended the scheme to Arndt, and arranged for Anderson and Modderman to teach her. Arndt explained the theory to her son, who, with prompting from Sagorski, wrote a series of sight drafts. The district court concluded that Sagorski should be found

---

[13]The amendments abandon this circuit's interpretation of intended loss and clarify that intended loss "includes intended pecuniary harm that would have been impossible or unlikely to occur." USSG § 2B1.1, comment. (n.2) (eff. Nov. 1, 2001).

[14]The addition of these amounts to the defendant's intended losses "bumps" the increase in the base offense level from 11 levels (for losses of more than $800,000) to 12 levels (for losses of more than $1.5 million).

---

culpable for the conduct of Arndt and Boerma because "one can say without a shadow of a question that he knew what [Arndt] and her son Boerma were doing, and the amounts that they defrauded and intended to defraud are culpable to him as a co-conspirator because it was clearly foreseeable within that portion of the conspiracy." Because Sagorski has not demonstrated that the district court's findings were either inadequately individualized or clearly erroneous, we find no error in the 12-level adjustment in the offense level under § 2F1.1.

Anderson was held accountable for intended losses of $2,205,749, of which only $31,000 was attributable to sight drafts she wrote herself. This resulted in a 12-level increase in the offense level for the § 514(a)(2) convictions. Anderson argues, as she did at sentencing, that it was not reasonably foreseeable that her "students" would write these sight drafts. She claims she merely explained the redemption theory and the use of the sight drafts and could not control what her "students" did with that "knowledge." The issue, however, is not control but foreseeability.

We find no error in the finding that it was reasonably foreseeable to Anderson that her coconspirators would write the sight drafts in question. She explained how the sight drafts could be used to escape debts and secure credit, showed them how to fill out the sight drafts, and encouraged the filing of false 8300s against those who rejected the sight drafts. The only coconspirator Anderson did not personally instruct was Boerma. Not only did Anderson fail to object to those sight drafts, but any error in the inclusion of the $156,000 in sight drafts written by Boerma would be harmless because even

without it the intended losses would still greatly exceed $1.5 million.[15]

## B.  Enhancements under USSG § 3B1.1 and § 3A1.2

Shriver received a two-level enhancement under USSG § 3B1.1(c) for her role in the offense as "an organizer, leader, manager, or supervisor" of the criminal activity. To qualify for this adjustment, the defendant must have exerted control over at least one other participant in a supervisory, managerial, leadership, or organizational capacity. *United States v. Caseslorente*, 220 F.3d 727, 734-35 (6th Cir. 2000). Although the district court did not identify an individual over whom Shriver exerted control, we can infer the necessary finding from the district court's explanation that she had a leadership role in that she secured the sight drafts, met with and connected people, and had a leadership role both pretrial and at trial. *United States v. Dupree*, 323 F.3d 480, 494 (6th Cir. 2003); *see also Caseslorente*, 220 F.3d at 736 (although preferable, it is not required that the district court state the specific facts relied on in applying § 3B1.1 enhancement). The record indicates that Shriver was an organizer in the conspiracy and an instigator among the defendants at trial. The government notes that there can be little doubt that she exerted control with respect to the participation of her husband. It was not clearly erroneous for the district court to find the enhancement applied to Ruth Shriver.

Anderson appeals from the 3-level enhancement imposed under USSG § 3A1.2(a), which applies if "the victim was a government officer or employee . . . and the offense of conviction was motivated by such status." This enhancement was added to the offense level for the § 7206(2) offenses relating to the false 8300s. Although Anderson challenges the enhancement on the grounds that the target was really the government, rather than government officials, the district court did not clearly err in finding that the targets of the false 8300s covered individual government officials who were targeted because of their positions. For example, individuals targeted included an officer who issued a ticket to a defendant and a judge who presided over a court matter involving a defendant. Conceding that about half of the 8300s that were the subject of her convictions under § 7206(2) targeted federal or state employees, Anderson argues that it was error to apply the enhancement to all of those counts. However, the § 7206 convictions were grouped together without objection.

## C.  Upward Departures under USSG § 5K2.0 and § 5K2.7[16]

We have reviewed a district court's decision to depart upward or downward from the sentencing guideline range under an abuse of discretion standard. *United States v. Chance*, 306 F.3d 356, 393 (6th Cir. 2002). Recent amendments to 18 U.S.C. § 3742(e) require *de novo* review of whether a departure was based on proper factors, but

---

[15] Anderson also questions the accuracy of some of the figures included by the district court and complains that the adding machine tape referenced by the district court is not part of the record. Inviting this court to remand to expand the record, Anderson asserts that there are discrepancies in the totals of the sight drafts written by Arndt and Boerma. Anderson did not object to or ask for clarification concerning the amounts that were being included in the loss calculation, and we find no plain error.

---

[16] In a novel claim, Anderson argues that although proper notice was sent regarding possible departure under § 5K2.7, the district court had an obligation to amend that notice to advise her regarding the possibility of departure under § 5K2.0. We find no error, however, because the government's prehearing motion for departure adequately disclosed that departure under § 5K2.0 was at issue. *Burns v. United States*, 501 U.S. 129, 138 (1991) (notice is required before the district court may depart upward "on a ground not identified as a ground for departure in the presentence report or in a prehearing submission by the Government").

review of the extent of such a departure continues to be for abuse of discretion. *See* PROTECT Act of 2003, § 401(d), Publ. L. No. 108-21, 117 Stat. 650 (2003). Because we would affirm the upward departures under either standard, we need not decide whether this modification applies to appeals pending as of the effective date of the PROTECT Act.

The applicable guidelines allow for upward departures when "there exists an aggravating . . . circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b); *see* USSG § 5K2.0 (2000). When a factor being considered is an encouraged factor, the court may depart if the applicable guideline does not already take the factor into consideration, or, if already taken into account, it is present to a degree that makes the case different from the ordinary case in which it is present. *Koon v. United States*, 518 U.S. 81, 95-96 (1996).

Once the district court excluded all of the false 8300s and many of the sight drafts from the loss calculations, the offense level could not be increased under USSG § 2F1.1(b)(1) for any of the convictions under § 7206, or for Ruth Shriver's conviction under § 514(a)(2). Granting the government's motion for upward departures under USSG § 5K2.0, the district court found that without additional increases the offense level would not reflect the seriousness of the defendants' conduct. As the commentary to USSG § 2F1.1 explains: "In cases in which the loss determined under subsection (b)(1) does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted." USSG § 2F1.1, comment. (n.11). Shriver, Anderson, Sloboda, and Goodwin challenge these departures.

In addition, the district court provided defendants with notice of its intention to consider upward departure under USSG § 5K2.7, which provides, in part, that "[i]f the defendant's conduct resulted in a significant disruption of

governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected." The district court found that the disruptions during trial represented significant disruption of a governmental function for which upward departures would be warranted in calculating the offense levels for both the § 514(a)(2) and § 7206 offenses. Anderson, Sloboda, and Shriver appeal from these departures.

### 1. Shriver

Convicted of one count each of conspiracy and violating § 514(a)(2), Shriver had an adjusted offense level of 10 prior to any departure. The district court found this offense level did not accurately reflect the seriousness of her conduct and granted an 8-level upward departure under USSG § 5K2.0. In explaining the reasons for this departure, the court noted that the one sight draft at issue for $1.75 million was sent to the IRS at a time when Ruth and Jack Shriver had a tax obligation of $114,000. Given the amount of the sight draft, however, the district court did not increase the base offense level to account for intended losses. Nonetheless, the court found that the sight draft sent to the IRS was obviously designed to commit fraud and the tax liability related to her own anti-government animus. The district court also found that, in addition to the enhancement under USSG § 3B1.1(c), the extent of her participation in the larger conspiracy had not been taken into account. In deciding to upwardly depart 8 levels, the district court observed that a loss of $114,000 would alone result in a 6-level increase in the offense level under USSG § 2F1.1(b)(1).[17]

---

[17] The court later rejected the government's request for further enhancement for more than minimal planning under USSG § 2F1.1(c) because Shriver's overall participation in the conspiracy was factored into the USSG § 5K2.0 departure.

Turning then to the question of departure under USSG § 5K2.7, the district court explained that additional upward departure was "absolutely necessary" because Shriver was one of the leaders of the disruptive behavior and because she repeatedly engaged in the disruptive behavior, all of which demonstrated contempt for the process and everyone from judge to jury. As a result, the district court found Shriver's conduct warranted an additional 6-level increase in the offense level. She contends that this departure was an abuse of discretion because her behavior during trial was adequately taken into account by the 2-level enhancement for obstruction of justice. The district court found otherwise, emphasizing that the significant disruption of the trial was separate from the obstruction of the grand jury and contempt proceedings. We agree.[18]

### 2. Anderson

The district court granted a 6-level upward departure under USSG § 5K2.0 with respect to Anderson's § 7206 offenses only, after finding that the base offense level of 6 did not account for the seriousness of her conduct. In addition, she received a 4-level upward departure in the offense level for both the § 514(a)(2) offenses (counts 2-3) and the § 7206(2) offenses (counts 50-73) under USSG § 5K2.7.[19]

Taking issue with the USSG § 5K2.0 departure, Anderson mistakenly asserts that such a departure must relate to a financial loss. This assertion is refuted by the earlier quoted commentary to USSG § 2F1.1 authorizing departure when the

loss calculation does not reflect the harmfulness and seriousness of the conduct. Anderson also argues that this departure resulted in double counting when combined with the official-victim enhancement under USSG § 3A1.2. In particular, she emphasizes that more than half of the targets of the false 8300s were government officials. However, the district court explained the departure as warranted because the base offense level of 6 did not take into account the large number of false 8300s that Anderson had aided, assisted, or counseled others to file. This is distinct from the enhancement based on the status of the targets themselves. The USSG § 5K2.0 departure did not result in double counting of the same factor. Sloboda and Goodwin, who join in this argument, also received a 6-level departure under USSG § 5K2.0 based on the number of false 8300s they each filed in an attempt to subvert the IRS and harass the targets (in each case a dozen).[20]

Appealing the 4-level upward departures under USSG § 5K2.7, Anderson argues, as she did at sentencing, that they constituted double counting of the same conduct addressed by the 2-level enhancement for obstruction of justice. As with Shriver, however, it is clear that these departures addressed separate conduct from the obstruction of justice enhancement. Alternatively, Anderson suggests the USSG § 5K2.7 departures were error because the trial court could have exercised its contempt powers during trial.

The district court considered this possibility, but found it inappropriate because to bring criminal contempt charges at trial could have "anointed these people with martyrdom."

---

[18]With a total offense level of 24 and a criminal history score of 0, the guideline range was 51 to 60 months. Shriver was sentenced to 60 months' imprisonment on each count, to run concurrently.

[19]Anderson was sentenced to 60 months on the conspiracy count, 120 months on the § 514(a)(2) convictions, and 36 months on the § 7206 convictions, to run concurrently.

---

[20]Sloboda was sentenced to concurrent terms of 37 months' imprisonment on the conspiracy count and 36 months on each of the two § 7206 convictions. Goodwin received concurrent terms of 46 months' imprisonment on the conspiracy count and 36 months each on his two § 7206 convictions.

The district court also explained that "this is not all about contempt. This whole trial, this whole issue, redemption theory, . . . was illustrative of contempt for all authority. Not just judicial authority, but all authority. This contempt for judicial authority was just one aspect of the contempt for governmental authority within a democracy." We find no error in the determination that upward departures were appropriate under USSG § 5K2.7.

In a related "piling on" argument, Anderson suggests the departures were not necessary because removing her and the others from the trial was punishment enough. That was a question of courtroom management, with defendants being invited to return to the courtroom twice every day, and was not adequately reflected in the sentencing calculations absent the departure. Finally, Anderson challenges the extent of the departures as unreasonable. We cannot say that the 4-level departures under USSG § 5K2.7 represent an abuse of discretion. In particular, the district court emphasized that the conduct involved multiple incidents of disruptive conduct that significantly disrupted an important judicial function.[21]

**AFFIRMED.**

---

[21]Sloboda, who adopts Anderson's arguments on this issue, also received a 4-level upward departure under USSG § 5K2.7 for the same reasons.