In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-3762, 00-3763

United States of America,

Plaintiff-Appellee,

v.

Juan Pedroza and Hilario Pedroza,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 192--George W. Lindberg, Judge.

Argued March 29, 2001--Decided October 18, 2001


  Before Easterbrook, Rovner, and Diane P.
Wood, Circuit Judges.

  Diane P. Wood, Circuit Judge.  In March
1999, federal agents found two kilograms
of cocaine in Juan Pedroza's car, $61,000
in cash and various drug paraphernalia in
his house, and $10,000 in cash and
ledgers recording drug transactions in
the home of his brother Hilario Pedroza.
After the district court denied the
brothers' motions to suppress this
evidence, they entered conditional guilty
pleas to conspiracy to possess cocaine
with intent to distribute in violation of
21 U.S.C. sec. 846. In this appeal, the
Pedrozas challenge the district court's
denial of their suppression motions as
well as the district court's refusal to
dismiss their indictment for violation of
the Speedy Trial Act, 18 U.S.C. sec.
3161. We affirm both convictions.

I

  On March 18, 1999, Drug Enforcement
Agency (DEA) agents were conducting
surveillance of Juan Pedroza, whom they
suspected of being involved in drug
activity. In the early afternoon, Juan
drove to Hilario's house in a 1991 Ford
Thunderbird, parked in front of the
house, and went inside. About twenty
minutes later, he returned to the
Thunderbird and drove around to an alley
behind the house, where Hilario passed a

brown cardboard box to Juan through the car window. Juan then drove back to his own residence. After he stopped the car, he sat in it for a few minutes and then went into the house empty-handed. About thirty minutes later, Juan left again, this time driving a Jeep Cherokee. Agents looked through the windows of the Thunderbird but were unable to see the cardboard box. This roused their suspicions that the Thunderbird had a secret compartment, and that Juan had hidden the box in it.

Other agents followed Juan when he left in the Cherokee. After awhile, it became evident from the way Juan was driving that he knew he was being followed, and so the agent in charge instructed the pursuing agents to contact Juan and question him if possible. A few minutes later, Agent Dan Foley pulled up next to Juan at a stop light, showed Juan his police badge, and said, "Police, would you mind talking to us?" According to Foley, Juan said, "Yes, he would," and then drove through the intersection and promptly pulled over to the curb. Foley turned right and pulled over just around the corner from Juan. At that point, a traffic officer at the corner directed Juan and the agents to move from the intersection to a laundromat parking lot a short distance away, which they did.

After Juan stopped his car in the parking lot, a total of four DEA agents, each in his own car, also pulled into the lot. Although Juan testified that his car was blocked by the agents' cars, the agents testified, and the district court specifically found, that Juan's car was not blocked. Initially, two English-speaking agents spoke briefly with Juan. A bilingual agent, Agent Lou Dominguez, then approached Juan, identified himself as a police officer, and asked Juan if he was more comfortable speaking English or Spanish. Juan preferred to speak Spanish, so Dominguez conducted the remainder of the encounter in Spanish. Dominguez told Juan that the agents were investigating drug trafficking and asked Juan if he was involved in any such activities. Juan said he was not. Dominguez next asked Juan if he had any contraband in the Jeep. Juan replied that he did not and volunteered permission for the agents to search the vehicle.

At that point, Dominguez told Juan he was going to pat him down for the agents' protection. Dominguez conducted a brief pat-down search which turned up cell phones and pagers, but no weapons or contraband. The cell phones and pagers were eventually confiscated, although Agent Dominguez could not recall whether they were taken at the time of the pat-down search or later. After the pat-down search, Dominguez continued to question Juan, and Juan continued to respond to the agent's questions. Three other agents searched the Jeep while Dominguez and Juan continued to talk. The agents found no contraband in the Jeep.

While the Jeep was being searched, Dominguez asked Juan where he lived and if he owned any other cars. Juan gave his address and said he owned a Ford Thunderbird. Dominguez asked if Juan had any contraband at home or in the Thunderbird, and Juan again said that he did not. Juan then volunteered permission for the agents to search his home and the Thunderbird and said that his wife was at home and could give the agents the keys to the Thunderbird. Dominguez radioed an agent who was conducting surveillance at Juan's house and notified him of the consent to search the house and the Thunderbird. Agents at the house knocked on the door and informed Mrs. Pedroza that Juan had given them consent to search the Thunderbird; she gave them the keys. The search of the Thunderbird revealed that the missing cardboard box was in fact hidden in a secret compartment, and the box turned out to hold two kilograms of cocaine.

The agents at the house then radioed back to Dominguez and had him arrest Juan. Dominguez read Juan his Miranda rights in Spanish, and Juan said that he understood them. The agents next transported Juan back to his house, unhandcuffed, where they conducted the search of the house to which Juan had previously consented. Agents found drug paraphernalia, a gun, and approximately $61,000 in cash in the house.

After Juan was arrested, he told the arresting agents that he had obtained the two kilograms of cocaine from Hilario. On the basis of this information, the agents decided to arrest Hilario also. About five agents met at a parking lot near

Hilario's home to carry out the arrest. The agents wore gun belts and bullet-proof vests with the word POLICE emblazoned on them. Three of the agents approached Hilario's front door while the other two went around to the back. When the agents approached the door, it was ajar, although the storm door was closed. The agents could see Hilario walking toward the front of the house. Agent Dominguez, who was the first one on the porch, knocked and said, "Police, we'd like to talk to you," to which Hilarioreplied, "Come on in." The agents entered the house and immediately arrested Hilario. Agent Dominguez asked Hilario in Spanish if he would mind if the agents looked around for any other individuals, and Hilario said no. The agents then conducted a security sweep of the house while Dominguez explained to Hilario why he was being arrested and read Hilario his Miranda rights. Hilario waived his rights and agreed to speak to the agents. Dominguez asked Hilario if he had any drugs, guns or contraband in the house; Hilario said he did not. Dominguez asked Hilario if the agents could search the house, and Hilario gave his consent. Dominguez also asked Hilario if the garage attached to the house and the vehicles in it were his and if the agents could search them; Hilario indicated that they were his and gave his permission for the search. Ultimately, the search of Hilario's home and garage turned up $10,000, which Hilario admitted was drug money. The agents also found several ledgers detailing drug transactions.

II

In the district court, both Juan and Hilario moved to suppress the evidence seized from the Thunderbird and from their homes. Juan argued that the agents effectively arrested him without probable cause when they initially stopped him, and that his subsequent consent to the search of his home and the Thunderbird was the fruit of the illegal arrest. Hilario argued only that he did not voluntarily consent to the search of his home. The district court, relying on the recommendation of a magistrate judge, found that Juan's encounter with the agents was consensual and that Hilario voluntarily consented to the search of his home.

Many of the arguments that the Pedrozas make in this appeal are nothing more than challenges to the factual findings and credibility determinations of the magistrate judge. Such arguments are almost always fruitless on appeal. As there is nothing physically impossible or otherwise disqualifying about these findings and determinations, we reject those arguments here. The magistrate judge held two days of hearings at which he heard testimony from both brothers and from several of the agents who were involved in the searches. The story that the Pedrozas told about the events of March 18 differed markedly from the agents' description of the events. At the conclusion of the hearings, the magistrate judge expressly found that the agents all gave testimony that was non-evasive and internally consistent and that each agent's testimony was consistent with that of the other agents. In contrast, the magistrate found that both Juan and Hilario gave testimony that was inconsistent, evasive, and unreliable. Accordingly, the judge credited the agents' version of the events and refused to credit the Pedrozas' versions. We give special deference to such credibility determinations, which can virtually never be clear error. See, e.g., Clark v. Runyon, 116 F.3d 275, 278 (7th Cir. 1997). Accordingly, we will evaluate the legality of the stops on the basis of the facts as the magistrate judge found them.

With that much established, we cannot find that Juan's consent to the search of his house and the Thunderbird was the product of an illegal seizure. Whether an encounter with the police is consensual is a factual question dependent on all the circumstances surrounding the encounter. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Ultimately, whether an encounter is consensual depends on whether "a reasonable person would [have felt] free to disregard the police and go about his business." Florida v. Bostick, 501 U.S. 429, 434 (1991).

Juan points out that, according to the agents' testimony, when Agent Foley first asked Juan if he would mind pulling over and speaking to the agents, Juan verbally responded, "Yes." According to Juan, this answer signified that, yes, Juan would mind speaking to the agents; in other

words, Juan did not want to speak with them. Because Juan initially stated that he did not wish to speak to the police, his counsel reasons, the fact that Juan nevertheless wound up pulling over and speaking with them indicates that he was not free to leave.

But Juan's response was at best ambiguous: it could just as easily have signified, "Yes, I will speak with you." Taken together with his conduct immediately following the verbal exchange, any ambiguity disappears, and it becomes clear that Juan was agreeing to have a conversation with the agents. Juan did not hesitate in pulling his car over to the curb after Agent Foley's request. According to the agents' testimony, although Foley also stopped, he did not pull up behind Juan but instead turned a corner and stopped there. Juan argues that, when the traffic officer waved him away from the curb and into the laundromat parking lot, he believed that he was being ordered to stop, but this conflicts with both the magistrate judge's credibility findings and the objective circumstances of the situation. It would have been clear to a reasonable person in this situation that the traffic officer was interested only in keeping a busy intersection clear of obstructions and was not ordering Juan to do anything other than clear the intersection. Even more telling is the fact that the traffic officer gave Juan no directions at all until after he had voluntarily pulled over to the curb. Nothing Agent Foley or any of the other agents present did should have made Juan feel he was being compelled to stop. A reasonable person faced with Agent Foley's question whether he would mind speaking with police would have thought that he was free to "disregard the police and go about his business." Bostick, 501 U.S. at 434. That Juan instead stopped to speak with the agents indicates that the encounter, at its inception, was consensual.

The next phase in Juan's encounter with the agents was the pat-down. Early in their conversation, Agent Dominguez told Juan that he was going to pat Juan down for the agents' protection. Apparently without giving Juan an opportunity to object, Dominguez proceeded to do just that. A protective pat-down search of

this nature is appropriate only if the agents have at a minimum some articulable suspicion that the subject is concealing a weapon or poses a danger to the agents or others (unless, of course, the subject consents to the search). See Terry v. Ohio, 392 U.S. 1, 27 (1968). Dominguez never sought Juan's consent to conduct the pat-down search, and we have serious doubts as to whether the facts the agents chose to present at the suppression hearing meet even the minimal standards of articulable suspicion. If the pat-down search had turned up incriminating evidence, we would find the question whether any such evidence should be suppressed a very close one.

We need not decide that question, however, because the pat-down search revealed no such incriminating evidence, and it thus contributed nothing to the later discovery of the drugs, money, and paraphernalia. Instead, after the pat-down, Agent Dominguez continued to talk with Juan, and Juan continued to answer Dominguez's questions freely. The evidence that Juan wants suppressed was discovered not as a result of the pat-down search but during the search of the Thunderbird and his home. As to the latter searches, there can be no question about the voluntariness of Juan's consent. On the record as established by the district court, in fact, Juan volunteered permission for the agents to search his home and the Thunderbird even before the agents asked for it. The only question we face, then, is whether, assuming the pat-down search was illegal, that illegality tainted the remainder of the encounter between Juan and the agents and vitiated Juan's consent to the later searches. In our view, it did not.

As a general rule, if a seizure of a suspect, such as the pat-down search here, is illegal, the illegal seizure will vitiate the suspect's subsequent consent to a search unless the state proves that the consent "resulted from an independent act of free will." United States v. Thompson, 106 F.3d 794, 798 (7th Cir. 1997), citing Florida v. Royer, 460 U.S. 491, 501 (1983). Stated differently, the question is "'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or

instead by means sufficiently distinguishable to be purged of the primary taint.'" United States v. Green, 111 F.3d 515, 520 (7th Cir. 1997), quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963). In determining whether the consent is sufficiently distinguishable from the primary taint, three factors are relevant: "(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct," id. at 521, although none of these factors alone is determinative.

In this case, even assuming that the pat-down search was illegal, we believe that there was ample evidence that Juan's consent to the search of his home and his Thunderbird resulted from an independent act of free will and not from any exploitation of the questionable pat-down search. As we noted above, there is no question that Juan's encounter with the agents began with his voluntary consent to speak with them; this is not a situation in which an illegal arrest or Terry stop is the sole reason the suspect is talking to the police at all. Prior to the pat-down search, Juan was apparently willing to talk freely with the agents, and according to Agent Dominguez, he was equally willing to do so after the pat-down search was concluded. Juan was told that the pat-down was for the agents' protection, and the pat-down did not turn up any weapons or incriminating items. It is unlikely that a reasonable person would have felt free to leave before the pat-down search, but then would have felt she was being restrained after the search was concluded and the agents found nothing incriminating.

With this context in mind, we turn to the moment at which Juan gave the agents permission to search his house and the Thunderbird. At this point, it is critical to note that Agent Dominguez never asked Juan for permission to conduct this search. Rather, Dominguez asked Juan where Juan lived and whether he had any other cars, and Juan gave his address and told the agent he owned a Ford Thunderbird. Dominguez asked if Juan had any drugs or other contraband in his house or the Thunderbird, and Juan said he did not. At that point, without

further prompting by Dominguez, Juan not only volunteered permission for the agents to search his house and the Thunderbird, but also went on to tell the agents that his wife would be at home and could give them the keys to the Thunderbird. The fact that Juan offered permission for the searches without being asked, and even went so far as to give the agents instructions for getting the car keys from his wife, strongly suggests that Juan's consent was an independent act of free will. The fact that the house and car were at a remote location bolsters this conclusion, as a reasonable person could not have thought, based only on the questions that Agent Dominguez asked, that he was being required to submit to a search of his home and all his vehicles.

It is true that the consent followed closely on the heels of the questionable pat-down search, which could suggest that the consent was a product of that search. In this case, however, we find that the other two factors indicate the voluntariness of the consent and outweigh the temporal proximity. First, Juan's decision to volunteer permission for the search, without being asked by the agents, can be seen as an intervening circumstance that removed the taint of the illegal pat-down. This was not a situation in which the agents demanded (or even asked) that Juan consent to a search, and they surely were not required to turn down Juan's offer merely because the encounter was possibly tainted by the pat-down search. Similarly, we find that, although the agents may have lacked an articulable suspicion to justify the pat-down search, that is also a close question. The agents' violation of Juan's rights, if one occurred, was not flagrant. More importantly, it is clear from Agent Dominguez's account that the only purpose of the pat-down search was to determine if Juan was carrying any weapons. There is no suggestion that the search was a ruse to intimidate Juan or to force him to answer the agents' questions.

The record simply provides no indication that the agents tried to exploit the questionable pat-down search to secure Juan's consent to search his home and Thunderbird. To the contrary, it is not even clear that the agents would have

sought such permission had Juan not raised the subject. On these facts, we have no trouble concluding that Juan's decision to permit the search was an independent act of free will, and we therefore affirm the district court's decision not to suppress the evidence found at Juan's home and in the Thunderbird.

III

We turn now to Hilario's arguments for suppression. The agents who arrested Hilario did not have a warrant either for the arrest or for a search of his home, and the government recognizes that they could not legally have entered the home or conducted the search without Hilario's consent. See Payton v. New York, 445 U.S. 573, 586 (1980) ("[S]earches and seizures inside a home without a warrant are presumptively unreasonable."). The agents maintain, and the district court found, that Hilario freely invited the agents into his home and consented to the search. Hilario, on the other hand, argues that he did not freely consent to the entry or the subsequent search, but instead merely submitted to an "exuberant" show of force by the DEA agents. Whether Hilario freely and voluntarily consented to the search of his home is a fact question, which we review only for clear error. United States v. Raibley, 243 F.3d 1069, 1076 (7th Cir. 2001).

Hilario's argument that the agents used an excessive amount of force in arresting him and in coercing his "consent" to the search is based largely on Hilario's own version of the facts, not on the agents' version. Unfortunately for him, the magistrate judge specifically found that the agents' version was the more credible of the two. In light of this finding, it is plain that Hilario freely consented both to the agents' entry into his home and to their search. According to the agents' testimony, they approached the front door at around 7 p.m., knocked, identified themselves, and asked to speak to Hilario. Hilario responded by saying, "Come on in." No guns were drawn. Hilario's consent to their entry was immediate; the agents did not make repeated requests, and Hilario was not in police custody at the time.

Similarly, there was ample evidence to conclude that Hilario's consent to search his house was free and voluntary. Although Hilario had been arrested when he gave that consent, he had been in custody only a short time, and he immediately gave his consent the first time the agents asked to conduct the search. Hilario had been read his rights, said he understood them, waived them, and agreed to speak with the agents. No guns were drawn. Hilario was not handcuffed, nor was he threatened in any way. The district court specifically found that the agents conducted the encounter in a cordial and professional manner and that no coercive tactics were used. We have no reason to believe that this conclusion was clearly erroneous, and we therefore affirm the denial of Hilario's suppression motion.

IV

Finally, we must consider the Pedrozas' assertion that the indictment against them should have been dismissed because delays in the trial court violated the Speedy Trial Act, 18 U.S.C. sec. 3161. That statute requires that defendants be brought to trial within 70 days of the date of indictment, excluding certain periods. The periods excludable from the 70-day period include all the time between the filing of a pretrial motion and the hearing on that motion, 18 U.S.C. sec. 3161(h)(1)(F); Henderson v. United States, 476 U.S. 321, 326-30 (1986), any time between the hearing and the date on which the district court receives the last filing necessary to make a decision on the motion, id. at 331, and, in the case of a single pretrial motion, up to thirty additional days during which the motion is under advisement, 18 U.S.C. sec. 3161(h)(1)(J).

Juan and Hilario were indicted on April 13, 1999. They filed their motions to suppress on May 20, 1999. The Pedrozas agree that the time between April 13 and May 20 was excludable from the speedy trial clock because of various continuances. On June 18, 1999, Juan and Hilario filed motions to revoke detention. The district court determined that it would not hold a hearing on the motions to revoke detention until after the suppression motions were resolved.

The magistrate held a two-day hearing on the suppression motions on August 18-19, 1999, and the last brief on the motions was filed September 15, 1999. The time between May 20 and September 15 was properly excludable as time between the filing of the suppression motions and the date on which the last brief necessary to the decision of the motions was filed. See Henderson, 476 U.S. at 326-31. The troublesome delay arose here because the district court did not rule on the suppression motions until January 14, 2000, 121 days after the last document necessary to decide the motions was filed. Because only the first 30 days after the suppression motions were taken under advisement were excludable, the Pedrozas reason, the district court missed the 70-day deadline by 21 days. (The Pedrozas have not argued that any of the time between January 14 and July 12, when the Pedrozas entered their guilty pleas, affects the Speedy Trial Act calculus.)

The government argues that the time it took for the district court to decide the suppression motions was irrelevant, because throughout that time, the Pedrozas' motion to revoke detention was pending. It finds support for this argument in the Henderson decision, which held that 18 U.S.C. sec. 3161(h)(1)(F)'s exclusion for the time between the filing of a motion and its hearing applies to that entire time, regardless of whether the delay before the hearing is "reasonably necessary." 476 U.S. at 329-30. The Pedrozas respond, not without reason, that the district court had refused to act on their motion to revoke detention until the suppression motions were decided, and that to allow the pendency of the motion to revoke detention to toll the Speedy Trial Act limitation no matter how long the court then took to decide the suppression motions would thwart the purposes of the Act. While we are sympathetic to the Pedrozas' argument on this point, we ultimately need not decide this question, because we find that the district court's resolution of the suppression motions was timely.

Although the Speedy Trial Act allows only 30 days of excludable time after the last brief on a motion is filed if only a single pretrial motion is pending, when

a district court must contend with multiple motions, we have held that the 30-day period can be extended as long as the court resolves all pending motions with "reasonable promptness." United States v. Salerno, 108 F.3d 730, 737 (7th Cir. 1997). While the "reasonable promptness" standard is not susceptible to mathematically precise definition (and we specifically reject any mechanical standard such as 30 days per motion), we have found that trial courts have acted with reasonable promptness when they have taken 42 days to decide seven motions, United States v. Tibboel, 753 F.2d 608, 612 (7th Cir. 1985), 68 days to decide eight motions, United States v. Latham, 754 F.2d 747, 753 (7th Cir. 1985), and 50 days to decide 24 motions, United States v. Cheek, 3 F.3d 1057, 1066-67 (7th Cir. 1993).

In this case, the district court was considering a total of four suppression motions brought by two different defendants. Each motion raised a number of constitutional questions, and the hearings on the motions lasted two days. Although the district court took 121 days to decide the motions, we need not decide whether the entire 121 days was excludable. Rather, if we can consider 51 of these days to be excludable time, then the district court resolved the motions within the 70 days of non-excludable time that the Speedy Trial Act allows. Taking 51 days to decide four complex suppression motions is reasonable and is in keeping with the time periods we have approved in the past. Therefore, we find that at least 51 of the days while the suppression motions were under advisement were excludable from the speedy trial clock, and that the district court met the Speedy Trial Act's 70-day deadline.

The Speedy Trial Act was not violated in this case, and the district court did not err in denying the Pedrozas' suppression motions. Accordingly, we Affirm both judgments of the district court.