**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Steven C. SMITH, Defendant–
Appellant.**

No. 01–2196.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 13, 2001.

Decided Nov. 20, 2001.

Before Hon. FLAUM, Hon. BAUER, and Hon. TERENCE T. EVANS, Circuit Judges.

## ORDER

Police officers stopped a vehicle in which Steven Smith was a passenger because the muffler was too noisy. After the driver consented to a search of the vehicle, the officers discovered items associated with the manufacture of methamphetamine. The officers then searched Smith's residence and found additional drug-manufacturing paraphernalia that led to the criminal charges against Smith. The district court denied Smith's motion to suppress the evidence from his home, finding that he had voluntarily consented to the search. Smith pleaded guilty to manufacturing methamphetamine and received a 97–month prison sentence. In executing the plea agreement, Smith reserved the right to challenge the district court's ruling on his motion to suppress, and he does so now on appeal. We affirm the judgment of the district court.

### Background

According to testimony at the suppression hearing, police officer Glen Holstlaw was patrolling near Smith's residence when he detected the smell of ether. He called to the area police officer Rod Boggs, who went to the residence to confirm the odor. Before Boggs could walk by Smith's house, however, a vehicle pulled away from the residence. Boggs notified Holstlaw of the departing vehicle via radio, described the vehicle, and mentioned that it had a noisy muffler.

Holstlaw stopped the vehicle because of the loud muffler. Smith was riding in the passenger seat but had to exit the vehicle after the driver, Amanda Motter, consented to a search of the car. With Motter and Smith standing nearby, Holstlaw and two other officers who had arrived on the scene searched both the passenger compartment and the trunk, finding fabric softener sheets, a gas container with attached rubber hose, ether, and other items associated with the manufacture of methamphetamine.

What followed next is disputed. Boggs maintained that he spoke with Smith about the items recovered in the vehicle search, expressed his belief that Smith was manufacturing methamphetamine, and asked to search Smith's house. Boggs also recalled advising Smith that he was not under arrest and would not be taken into custody that evening. Boggs testified that Smith answered with "something to the effect, 'Yes, we'll go there.'" A police officer who overheard this conversation testified that Smith said "Yes" to the request for consent to search his residence. And Motter offered testimony that Smith responded to Boggs by saying "Yes, you can. Do what you have to do."

Smith's recollection of the events differs. He testified that he denied Boggs permission to search his house with a simple "No." He claimed that Boggs then commented that "if I didn't give permission, I could just sit there for a couple hours until they got a search warrant." According to Smith, Boggs "said something about playing hardball, and if I wanted to play hardball, he could play hardball, too. And when he told me he was going to ... wait for a couple hours for a search warrant, I said, 'Well, do what you got to do.'"

After the exchange between Boggs and Smith, everyone at the scene–Smith, Motter, Officers Boggs and Holstlaw, and a third officer who had arrived to assist with the vehicle search–proceeded to Smith's residence. Smith testified that Boggs then handed him the keys and instructed him to open the door. Boggs, however, maintained that he clearly reiterated his intention to search the house, and Motter testified that Boggs asked Smith "Are you sure?" and Smith responded affirmatively.

Smith unlocked the door, and the police officers asked him and Motter to wait on the couch while they searched the residence. During the search, the officers discovered an "operational and in-production methamphetamine laboratory," as well as related paraphernalia including starter fluid, sulfuric acid, hydrogen chloride gas generators, coffee filters, various glassware, and a funnel. A week later, authorities arrested Smith and charged him with manufacturing methamphetamine.

Smith filed a motion to suppress the evidence, challenging, among other things, the search of his residence. The district court held a suppression hearing and heard testimony from Smith, Motter, Boggs, Holstlaw, and a third officer who had been present during both searches. At the conclusion of the hearing, the district court found that Smith had voluntarily consented to the search. In explaining its ruling, the court stated that it "finds credible the testimony of [the police officers]." The court went on to say that "Motter is not a witness you would want to go to the bank on for either side, but for whatever her testimony is worth, she corroborates the officers and not the defendant." On appeal Smith renews his objection to the search of his home.

### Analysis

After a district court's denial of a motion to suppress, we review questions of law de novo and findings of fact for clear error. *United States v. Mitchell*, 256 F.3d 734, 736 (7th Cir.2001). Credibility deter-

minations made by a district court will virtually never be clear error because the trial judge is best situated to resolve conflicting testimony. *E.g., United States v. Pedroza,* Nos. 00–3762, 00–3763, 2001 WL 1243390, at *3 (7th Cir. Oct. 18, 2001); *United States v. Woods,* 233 F.3d 482, 484 (7th Cir.2000). Unless the district court's factual findings and credibility determinations are "physically impossible or otherwise disqualifying," arguments against them "are almost always fruitless on appeal." *Pedroza,* 269 F.3d 821, 2001 WL 1243390, at *3.

■ On appeal, Smith raises two challenges to the district court's denial of his motion to suppress. First, Smith asserts that the district court erred in finding that he consented to the search of his home, and second, Smith maintains that the district court incorrectly deemed his consent to be voluntary.

■ As to the existence of consent, Smith identifies three facts overlooked by the court that he believes establish the government's failure to prove consent by a preponderance of the evidence. First, Smith highlights inconsistencies among the testimony of the police officers and Motter, pointing out that each witness gave a different characterization of his exact response to Boggs's request for consent. All three witnesses, however, agreed with the ultimate conclusion that Smith did in fact give consent. Minor inconsistencies and small differences in memory do not render testimony incredible as a matter of law, and the district court was thus entitled to credit that testimony. *See United States v. Hayes,* 236 F.3d 891, 896 (7th Cir.2001); *United States v. Jensen,* 169 F.3d 1044, 1047 (7th Cir.1999).

Second, Smith offers evidence to undermine Motter's credibility and argues that the district court clearly erred in relying on her testimony. Contrary to Smith's argument, however, the district court recognized that Motter's testimony was less than entirely credible, noting that she "is not a witness you would want to go to the bank on for either side" and acknowledging her testimony only in so far as it corroborated the officers' testimony.

■ Third, Smith points out that the officers never obtained a signed written consent form. Had he truly given his consent, Smith suggests, Boggs should have obtained some kind of written verification. Smith, however, offers no legal authority to support his argument that written consent is required to establish that consent was given. On the contrary, consent to enter a residence need not be in writing, and indeed, it can even be nonverbal. *United States v. Walls,* 225 F.3d 858, 863 (7th Cir.2000).

■ Smith's next major argument on appeal is that, even if he did consent to the search, he did so under coercion, and the district court erred in finding that his consent was voluntary. Whether Smith voluntarily consented to the search of his home is a question of fact that must be decided based on the totality of the surrounding circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). That question must be evaluated in light of the facts as the district court found them. *Pedroza,* 269 F.3d 821, 2001 WL 1243390, at *3.

■ Smith argues that the district court's voluntariness determination is erroneous because the officers never informed him that he could refuse consent and because Boggs threat to "wait for a couple hours for a search warrant" was improper coercion. Police officers, however, need not inform someone of the right to refuse consent, *United States v. Navarro,* 90 F.3d 1245, 1257 (7th Cir.1996), and they may express their intention to obtain a warrant so long as it is a genuine intention and not

merely a "pretext to induce submission," *United States v. Scheets*, 188 F.3d 829, 840 (7th Cir.1999) (internal quotation marks and citation omitted).

In further support of his contention that he was coerced, Smith identifies several reasons to explain that he did not feel free to refuse the officer's request and leave the scene. *See, e.g., Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (holding that whether an encounter is consensual hinges on whether "a reasonable person would [have felt] free to disregard the police and go about his business"). Only two of these merit any discussion. First, Smith cites to Boggs' testimony at the suppression hearing that, had Smith attempted to walk away from the residence, Boggs would have stopped him. This argument, however, refers only selectively to Boggs' testimony. Boggs continued his statement and clarified that if Smith had walked away and Boggs had stopped him, Boggs would only have spoken with Smith to ask whether Smith was revoking consent and why he was leaving the scene. Under this scenario, no coercion could be reasonably inferred. Second, Smith testified that he believed he could not refuse Boggs' request to search his home because of a prior altercation with law enforcement during which Smith disobeyed a police officer and was subsequently beaten and thrown in jail. However, Smith also testified that the officers involved in this incident never threatened him, used handcuffs or physical force, or even raised their voices, and Boggs specifically told Smith that he was not under arrest. *See, e.g., United States v. Rice*, 995 F.2d 719, 724 (7th Cir.1993) (identifying factors to be considered in determining whether consent was voluntary). Moreover, Smith, who had three prior felony drug convictions, was not "an overawed youngster being confronted with law enforcement for the first time." *Rice*, 995 F.2d at 724. These factors along with the credibility determinations and factual findings by the district court reveal no clear error in the district court's conclusion that Smith voluntarily consented to the search of his residence.

Accordingly, we AFFIRM the judgment of the district court.