In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3771

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GARY L. PANSIER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05-CR-272—**Charles N. Clevert, Jr.**, *Judge*.

ARGUED SEPTEMBER 9, 2008—DECIDED AUGUST 12, 2009

Before FLAUM, WILLIAMS, and SYKES, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Gary Pansier, a tax protester, did not pay his taxes for many years. When federal, state, and local revenue agents attempted to collect his delinquent taxes, Pansier responded by requesting personal information from the individual agents and filing false forms with the Internal Revenue Service ("IRS"), claiming that the individual revenue agents had been involved in large cash transactions on his behalf. He

also attempted to satisfy his various tax debts with phony sight drafts, a type of financial instrument, which appeared to be drawn on a Treasury Direct account and issued under the authority of United States Department of Treasury. For his behavior, Pansier was convicted of obstructing the administration of the IRS, filing false IRS forms, and passing phony financial instruments with the intent to defraud.

On appeal, Pansier raises a number of challenges to his convictions, but we are not persuaded by any of them. Because we conclude that the district court was permitted to exclude at least thirty days to resolve multiple pretrial motions, the delays in Pansier's trial did not violate the Speedy Trial Act. The language of Count One of the indictment reveals that the count was not duplicitous and charged Pansier only with obstructing the due administration of the IRS under the omnibus clause of 26 U.S.C. § 7212(a). We further conclude that it is not an element of 26 U.S.C. § 7206(1), a perjury statute, that the false document passed was required to be filed by statute or regulation. Therefore, Counts Two through Nine of the indictment alleged all the necessary elements of the offense. And finally, the district court properly considered both the qualifications and the reliability of the government's expert witness and did not err in the admission of his testimony. We therefore affirm the judgment of the district court.

## I. BACKGROUND

Pansier and his wife refused to pay income and property taxes for many years. As a result, the IRS, the Wisconsin

Department of Revenue, and the Treasurer's Office of Marinette County each sent the Pansiers notice of their tax delinquencies. Pansier responded to these notices by returning them to the relevant taxing authority stamped with the words "accepted for value and exempt from levy." He also attached an IRS W-9 form, requesting personal information, including social security numbers and dates of birth, from the individual employees and state officials attempting collections. In each instance, when he received no response from the individual employee, Pansier filed a "Form 8300," an IRS form used to report cash payments over $10,000 received in one transaction or two or more related transactions, *see* 26 U.S.C. § 6050I. On each form, he falsely reported that the individual employee had made a cash payment on his behalf and had refused to provide a social security number or date of birth. Pansier also checked the "amends prior report" box as well as the "suspicious transaction" box, which is used to note that the individual is withholding information or attempting to prevent the form from being filed. *See* IRS Form 8300, http://www.irs.gov/pub/irs-pdf/f8300.pdf.

Among those individuals named by Pansier in the false Form 8300's were two employees of the Wisconsin Department of Revenue; the Treasurer of Marinette County, Wisconsin; the Secretary of Revenue for the State of Wisconsin; Judge William M. Atkinson of the Brown County, Wisconsin Circuit Court; and an IRS revenue officer assigned to Pansier's case. After receiving the false forms, the IRS entered each one into its database and sent notices to the individuals, requesting that they

provide the missing information and informing them of potential penalties if they failed to respond. Once the IRS investigated further, it discovered that the forms were false and removed all the entries from its database.

Next, in an attempt to dodge his tax bills, Pansier submitted as payment for taxes he owed to the IRS, the Wisconsin Department of Revenue, and Marinette County, phony financial instruments, which appeared to be sight drafts issued under the authority of the United States Department of Treasury. Sight drafts are financial instruments that are payable at the bearer's demand or on presentment to the drawer. Black's Law Dictionary 530 (8th ed. 2004). The sight drafts included a purported Treasury Direct routing number, listed Pansier's social security number as the Treasury Direct account number, and directed the recipient to seek payment from Pansier's Treasury Direct account. But Pansier did not have a Treasury Direct account, which is only an investment account that is administered by the United States Treasury Department's Bureau of Public Debt and cannot be used to pay third parties. *See* Treasury Direct, http://www.treasurydirect.gov/indiv/myaccount/myaccount.htm#TreasuryDirect. When the IRS received these phony sight drafts, it initially credited Pansier's account and attempted to present them for payment at several banks where they were dishonored.

In November 2005, a grand jury returned a 31-count indictment against Pansier, charging him with one count of obstructing the due administration of the IRS, *see* 26 U.S.C. § 7212(a); eight counts of filing under penalty of

perjury false IRS Form 8300's, *see* 26 U.S.C. § 7206(1); and twenty-two counts of fraudulently passing fictitious financial instruments, appearing to be issued under the authority of the United States, *see* 18 U.S.C. § 514(a)(2). Pansier made his initial appearance at an arraignment on January 27, 2006. Because Pansier argues that his trial was impermissibly delayed in violation of the Speedy Trial Act, we provide a detailed description of the procedural history of the case and the relevant dates following his initial appearance.

Pansier initially opted to proceed pro se and filed numerous pretrial motions, some of which were incomprehensible or irrelevant, while others, including multiple motions to dismiss the indictment, discovery motions, and a motion for a bill of particulars, arguably presented substantive issues. The government filed a motion for handwriting exemplars and one motion *in limine*. Judge William Griesbach ruled on many of these motions and denied Pansier's various motions to dismiss.

At the final pretrial conference, Judge Griesbach disclosed that one of the government's witnesses, Wisconsin Circuit Court Judge William Atkinson, is his former colleague and a friend. Nevertheless, at that time, Judge Griesbach concluded that he could remain impartial, and neither party objected. Pansier waived his right to a jury, and the case proceeded to trial.

In August 2006, Judge Griesbach found Pansier guilty of Counts One through Nine but reserved his ruling on the remaining counts pending the parties' post-trial briefs. Several weeks later, however, Judge Griesbach issued an

order in which he again informed the parties of his relationship with Judge Atkinson, and this time he invited them to move for his disqualification based on the possibility of an appearance of impropriety. Pansier accepted this invitation, and, consequently, in an order dated October 10, 2006, Judge Griesbach recused himself and vacated all his previous orders and findings in the case.

The case was reassigned to Judge Charles N. Clevert, Jr. Neither party filed anything until two months later when, on December 13, 2006, Pansier sought a clarification and modification of his conditions of release. On December 26, the government moved to revoke Pansier's bond. The district court set a hearing date for the motion. In the meantime, Pansier moved to dismiss the charges based on an alleged violation of the Speedy Trial Act. On January 26, 2007, the court revoked Pansier's bond and denied his Speedy Trial Act motion, finding that the numerous pretrial motions that had been filed before Judge Griesbach's recusal had been revived and were still pending. As a result, the court determined that the speedy trial clock was tolled. On February 9 Pansier filed the first in another series of pro se motions, and on February 22, the district court ruled on nine motions that had been filed before Judge Griesbach's recusal, as well as three motions that had been filed after the recusal, and ordered briefing on four outstanding motions, two of which had been filed before Judge Griesbach.

In March 2007, Pansier retained an attorney and, through counsel, filed four motions: (1) a motion to dismiss

Count One of the indictment as duplicitous; (2) a motion to dismiss Counts Two through Nine of the indictment for failure to allege all the necessary elements of the crime; (3) a motion to dismiss the indictment based on pre-indictment delay; and (4) a renewed motion to dismiss for violation of the Speedy Trial Act. The court denied each of these motions.

The case again proceeded to trial, this time before a jury. The government argued that Pansier had obstructed the due administration of the IRS by submitting the false Form 8300's, knowing that by checking the "amends prior report" and "suspicious transaction" boxes, the IRS would be sent on a wild goose chase, investigating the fictional transactions and, after discovering that no transactions had occurred, would be required to remove the false information in the IRS database. He further obstructed the administration of the IRS, the government argued, by submitting the fictitious sight drafts as payment for his federal taxes, knowing that, even if the drafts were not accepted as legitimate, the IRS would expend resources in attempting to process the drafts for payment. Counts Two through Nine reflected eight individual Form 8300's filed with the IRS, which, the government contended, Pansier signed under penalty of perjury, despite his knowledge that they were false as to a material matter, the very transaction reported. Finally, the government dismissed Counts Ten and Twenty-Seven but proceeded on the remaining counts, which all related to individual sight drafts that Pansier submitted, as the government contended, knowing them to be fictitious and appearing to be drawn under the author-

ity of the United States, with intent to defraud the various taxing authorities.

In support of these counts, the government presented the testimony of fourteen witnesses, including a number of individuals whom Pansier had named in the Form 8300's, several individuals who had received and attempted to process the fictitious sight drafts, and William Kerr, a bank examiner with the Office of the Comptroller of the Currency whom the court qualified as an expert witness over Pansier's objection. Kerr testified that the sight drafts submitted by Pansier were worthless financial instruments purportedly drawn upon a Treasury Direct account at the Treasury Department.

The jury found Pansier guilty of Counts One through Nine, Eighteen through Twenty-Six, and Twenty-Eight through Thirty, but acquitted him of Counts Eleven through Seventeen. The jury was hung on Count Thirty-One, and, as a result, the government dismissed the count. The district court sentenced Pansier to twenty-four months' imprisonment for each count, with the terms to run concurrently. This appeal followed.

## II. ANALYSIS

### A.  There was no Speedy Trial Act violation.

Pansier first argues that the district court erred in denying his motion to dismiss the case under the Speedy Trial Act, 18 U.S.C. § 3161. The Speedy Trial Act provides that no more than seventy days may pass between a defendant's initial appearance in court and the com-

mencement of trial. 18 U.S.C. § 3161(c)(1); *United States v. Harris*, 567 F.3d 846, 849 (7th Cir. 2009). The Act further provides, as relevant here, that "[i]f the defendant is to be tried again . . . following an order of [a trial] judge for a new trial," the speedy trial clock is reset and the new trial must begin within seventy days "from the date the action occasioning the retrial becomes final." 18 U.S.C. § 3161(e).

Indeed, Pansier's second trial commenced more than seventy days after Judge Griesbach's recusal order. In calculating the speedy trial clock, however, the Act specifically excludes the time from the filing of any pretrial motion until the hearing on that motion, 18 U.S.C. § 3161(h)(1)(D)[1]; *Henderson v. United States*, 476 U.S. 321, 328-29 (1986), as well as the time after the hearing until the district court receives the last filing it expects to receive on the motion, *Henderson*, 476 U.S. at 331; *United States v. Pedroza*, 269 F.3d 821, 829 (7th Cir. 2001).[2]

---

[1] The Speedy Trial Act was amended effective October 13, 2008. *See* Pub. L. 110-406, § 13 (2008), 122 Stat. 4291. That amendment eliminated two provisions under 18 U.S.C. § 3161(h)(1) and redesignated two provisions relevant to this appeal without substantive change: the provision that previously appeared at § 3161(h)(1)(F) is now found at § 3161(h)(1)(D), and the provision that previously appeared at § 3161(h)(1)(J) is now found at § 3161(h)(1)(H). We refer to the relevant provisions as amended.

[2] We note that the Supreme Court recently granted certiorari in *United States v. Bloate*, 534 F.3d 893 (8th Cir. 2008), *cert. granted*

(continued...)

The Act further excludes a maximum of thirty days after that last filing, during which a motion "is actually under advisement by the court," 18 U.S.C. § 3161(h)(1)(H); *see Henderson*, 476 U.S. at 329; *Pedroza*, 269 F.3d at 829-30. When a court is called upon to decide multiple motions, however, that period of advisement may be extended beyond thirty days as long as the court resolves the pending motions with "reasonable promptness." *Pedroza*, 269 F.3d at 830; *United States v. Salerno*, 108 F.3d 730, 737 (7th Cir. 1997); *United States v. Tibboel*, 753 F.2d 608, 612 (7th Cir. 1985).

The district court concluded that the Speedy Trial Act had not been violated because Judge Griesbach's recusal order, vacating all of his previous orders, including the convictions on Counts One through Nine, reset the speedy trial clock under 18 U.S.C. § 3161(e). The recusal order also revived all pretrial motions on which Judge Griesbach had ruled, and, the court explained, approximately thirteen motions were revived at the time of his recusal. So, additional time was excluded until the resolution of those motions, and, the court calculated, no more than fifty-nine days elapsed from the speedy trial clock before the case went to trial.

---

[2] (...continued)
129 S. Ct. 1984 (2009), to consider whether time allowed for the preparation of pretrial motions is also excludable under 18 U.S.C. § 3161(h)(1). Neither party, though, has argued that any time was excludable during the preparation of pretrial motions.

We review the district court's denial of Pansier's speedy trial motion de novo. *United States v. Farmer*, 543 F.3d 363, 368 (7th Cir. 2008). Pansier raises two challenges to the court's speedy trial clock calculation. First, he argues that the speedy trial clock was not reset under § 3161(e) because when Judge Griesbach recused himself, he did not also order a new trial. Pansier relies on *United States v. Crooks*, 804 F.2d 1441, 1445 (9th Cir. 1986), for the proposition that only an order setting the case for retrial triggers § 3161(e) and resets the clock with a fresh seventy days.

Pansier reads *Crooks* too broadly. In that case, the Ninth Circuit stated that the district court's order setting the case for retrial, and "not the dismissal of the jury, constituted the action occasioning the new trial." *Crooks*, 804 F.2d at 1445. But the Ninth Circuit later revised its holding in that case, refusing to apply § 3161(e) in such a narrow fashion. Rather, the court explained that the Act's "reference to trial following an order for 'new trial' refers to the granting of a motion for new trial *or its equivalent*, which would upset a verdict of conviction and occasion a new trial." *United States v. Pitner*, 307 F.3d 1178, 1182 n.3 (9th Cir. 2002) (emphasis added). Similarly, in this case, Judge Griesbach's order granting Pansier's motion for recusal and vacating the convictions on Counts One through Nine is the equivalent of a motion for new trial. That order upset the verdict of conviction and was the "action occasioning the retrial" within the meaning of the Act. *See* 18 U.S.C. § 3161(e). Moreover, Judge Griesbach's recusal order vacated his prior rulings on the numerous pretrial motions, thereby

reviving those motions, and nothing in the language of § 3161(e) requires otherwise.

Pansier also takes issue with the district court's exclusion of thirty days under § 3161(h)(1)(H) because, he contends, there is no evidence that the various pro se motions that were revived following recusal were actually "under advisement" in the two months following Judge Griesbach's recusal. He further argues that those motions were simply "nonsensical discovery motions" that were obviously meritless. Therefore, Pansier asserts that no time should be excluded for the multiple pretrial motions that were pending immediately after the order of recusal.

Although Pansier is correct that the docket reveals no activity immediately following Judge Griesbach's recusal, we are not persuaded that § 3161(h)(1)(H) requires the close factual inquiry that Pansier suggests to determine whether a motion was under advisement. Pansier relies on language in *United States v. Johnson*, 29 F.3d 940, 943 n.3 (5th Cir. 1994), which states that "a court must look more closely into the particular circumstances of that motion, *e.g.*, whether there was a hearing on the motion, or whether the motion was taken under advisement, to determine whether certain days are excludable." But in making that statement, the Fifth Circuit was simply distinguishing between the number of days that may be excluded in the case of a motion requiring a hearing and the number of excludable days for a motion that does not require a hearing and is simply taken under advisement. *See Johnson*, 29 F.3d at

943. And when no hearing is required, a motion is considered to be "actually under advisement" when the trial court receives all the papers it expects to receive regarding that motion. *Henderson*, 476 U.S. at 329; *United States v. Hemmings*, 258 F.3d 587, 593-94 (7th Cir. 2001); *Johnson*, 29 F.3d at 943. Here, the parties had already fully briefed many of the pending motions and the court expected no further filings on those motions immediately following recusal. Judge Clevert was therefore entitled to a new period of advisement in which to review those motions under § 3161(h)(1)(H). The question we must answer then, is whether the district court resolved those motions with "reasonable promptness." *See e.g.*, *Pedroza*, 269 F.3d at 830; *United States v. Cheek*, 3 F.3d 1057, 1067 (7th Cir. 1993).

In calculating the speedy trial clock, starting on October 11, 2006 until trial, the periods of time from December 26 through January 27 and February 8 until the trial began on June 18, 2007, were properly excluded under the Act, as Pansier concedes. That leaves eighty-nine days in dispute, from October 11 through December 25, 2006 and January 28 through February 8, 2007, during which the parties' multiple pretrial motions remained pending.

We do not measure reasonable promptness by a mathematically precise standard, *Pedroza*, 269 F.3d at 830-31, but we have previously held that the standard was met when a trial court decided four motions in fifty-one days, *id.*; seven motions in forty-two days, *Tibboel*, 753 F.2d at 612, eight motions in sixty-eight days, *United States v. Latham*,

754 F.2d 747, 753 (7th Cir. 1985); and twenty-four motions in fifty days, *Cheek*, 3 F.3d at 1067. At least thirteen motions were revived and pending after the recusal order, including a motion *in limine* and a motion for handwriting exemplars filed by the government. And although several of Pansier's pro se filings may not have required any action by the district court, *see United States v. Williams*, 511 F.3d 1044, 1052-53 (10th Cir. 2007) (refusing to exclude any time for a pro forma discovery motion that required no action by the court), Pansier filed four motions to dismiss the indictment, a motion for a bill of particulars, and multiple discovery motions. We need not decide, however, what amount of time constitutes reasonable promptness in deciding thirteen motions of this varied nature because, even excluding a mere thirty days, which would be reasonable for just one motion, only fifty-nine days elapsed from the speedy trial clock. Therefore, we find that the district court satisfied the Speedy Trial Act's 70-day deadline.

## B.  Count One is not duplicitous.

Next Pansier challenges his conviction for obstructing the due administration of the IRS, contending that Count One of the indictment is duplicitous. An indictment is duplicitous if it charges two or more offenses in a single count. *United States v. Starks*, 472 F.3d 466, 470 (7th Cir. 2006). Duplicity creates a risk that the jury might return a less than unanimous guilty verdict, potentially exposes the defendant to prejudice at trial and sentencing, and in some cases subjects the defendant to double jeopardy.

*United States v. Davis*, 471 F.3d 783, 790 (7th Cir. 2006). The district court denied Pansier's motion to dismiss Count One as duplicitous, a ruling that we review de novo. *Starks*, 472 F.3d at 468.

The statute at issue in Count One, 26 U.S.C. § 7212(a), states that an individual may be prosecuted if he or she:

> [C]orruptly or by force or threats of force (including any threatening letter or communication) endeavors to intimidate or impede any officer or employee of the United States acting in an official capacity under this title, or in any other way corruptly or by force or threats of force (including any threatening letter or communication) obstructs or impedes, or endeavors to obstruct or impede, the due administration of this title.

This provision contains two distinct clauses, which each describe a separate offense. *United States v. Lovern*, 293 F.3d 695, 700 & n.5 (4th Cir. 2002); *United States v. Kassouf*, 144 F.3d 952, 955 (6th Cir. 1998). The first clause prohibits specific threats against an officer or employee of the United States designed to intimidate or impede that officer's administration of the tax code, while the second clause, the so-called "omnibus clause," is aimed at all other activities which may obstruct or impede the administration of the code. *Lovern*, 293 F.3d at 700 & n.5; *United States v. Bowman*, 173 F.3d 595, 598 (6th Cir. 1999); *United States v. Kelly*, 147 F.3d 172, 175 (2d Cir. 1998).

Here, Count One of the indictment returned by the grand jury alleges that Pansier "corruptly endeavored to obstruct and impede the due administration" of IRS laws

by filing with the IRS "false Forms 8300, and fictitious financial instruments referred to as Sight Drafts. The defendant thereby used the IRS as a tool of retaliation against public employees for the lawful performance of their official duties. He filed the fictitious financial instruments in order to satisfy federal tax, interest and penalties due and owing as assessed against either himself and/or his wife." The count consists of six paragraphs, three of which describe the false Form 8300's that Pansier filed and state that "[i]n retaliation," Pansier reported on the forms that federal and state employees had made payments on his behalf, causing the IRS to process the forms and send notices to the employees. In the final paragraph the count alleges that "[i]n a further effort to obstruct and impede the due administration of the Internal Revenue laws" Pansier "filed with the IRS Sight Drafts as purported payment." Before trial, however, the district court struck from Count One all allegations of retaliation as a motive for the false forms, and the jury received the revised indictment absent any references to retaliation.

Pansier argues that the references in the original indictment to retaliation against public officials charge him with violating the first clause of 26 U.S.C. § 7212(a), while the references to the fictitious sight drafts charge him with violating the omnibus clause of that statute. And alternatively, Pansier argues, the indictment was constructively amended when the district court struck the references to retaliation from Count One but later permitted the government to present evidence that he retaliated against various public employees.

Pansier's reliance on the indictment's references to retaliation is misplaced. The language of Count One tracks the statutory language of the omnibus clause of 26 U.S.C. § 7212(a) and states that his actions in filing the Form 8300's *and* the fictitious sight drafts were intended to obstruct the due administration of the code. There is no allegation that the Form 8300's were intended to intimidate or impede individual federal tax officers, a required element of the statute's first clause, *see Kassouf*, 144 F.3d at 955, and the relevant paragraphs explain that the Form 8300's named both federal and state officials—the latter of which are relevant only for the omnibus clause of § 7212(a). We conclude then that the indictment charges only a violation of the omnibus clause of § 7212(a) and is not duplicitous.

Moreover, even if we were to assume that the indictment is duplicitous, Pansier fails to identify any prejudice that this may have caused him. *See Starks*, 472 F.3d at 471. There was no risk of a non-unanimous verdict because the jury received the revised indictment absent any reference to retaliation, and, accordingly, as instructed, the jury could only find Pansier guilty of Count One by finding that he "corruptly endeavored to obstruct or impede the due administration of the internal revenue laws," and that he "did so knowingly and intentionally."

Nor was there a constructive amendment of the indictment. "Constructive amendment of an indictment occurs where the permissible bases for conviction are broadened beyond those presented to the grand jury." *United States v. Blanchard*, 542 F.3d 1133, 1143 (7th Cir. 2008). Pansier

argues that the government presented evidence of retalia-
tion against public employees and that the court erred
in striking all references to retaliation from the indict-
ment. But the government simply presented evidence
relevant to the Form 8300's and did not pursue a theory of
intimidation at trial. And, rather than adding additional
bases for conviction, the court removed only non-essential
language from the indictment, properly ensuring that
there could be no confusion as to the factual basis for the
charge. *See United States v. Alhalabi*, 443 F.3d 605, 613-14
(7th Cir. 2006) (finding no error where court struck from
the indictment only information that was immaterial to
the crime charged).

**C.  Counts Two through Nine were sufficiently charged.**

An indictment must state all the elements of the crime
charged. *United States v. Moore*, 563 F.3d 583, 585 (7th Cir.
2009). In his next attack on the indictment, Pansier argues
that Counts Two through Nine, which alleged that he
willfully made and subscribed false statements on the
Form 8300's in violation of 26 U.S.C. § 7206(1), were
defectively charged. Section 7206(1) is violated when a
person "[w]illfully makes and subscribes any return,
statement, or other document, which contains or is
verified by a written declaration that it is made under
the penalties of perjury, and which he does not believe
to be true and correct as to every material matter." 26
U.S.C. § 7206(1). Pansier argues that the government
failed to allege in the indictment or prove at trial what he
contends is an element of the crime: that IRS code or

regulation requires the Form 8300's to be filed. Without this element, Pansier argues, the government cannot show that the information contained in the Form 8300 was false as to a "material matter." In support of this contention, he relies on *United States v. Levy*, 533 F.2d 969, 975 (5th Cir. 1976), for the proposition that a form not required by statute or regulation cannot be the basis of an offense under § 7206(1).

We are not persuaded by this argument. Section 7206(1) is a perjury statute, *United States v. Scholl*, 166 F.3d 964, 980 (9th Cir. 1999), and therefore "requires only that the taxpayer file a return 'which he does not believe to be true and correct as to every material matter,'" *United States v. Peters*, 153 F.3d 445, 461 (7th Cir. 1998) (quoting § 7206(1)); *see United States v. Presbitero*, 569 F.3d 691, 700 (7th Cir. 2009); *United States v. Murphy*, 469 F.3d 1130, 1137-38 (7th Cir. 2006) (distinguishing between 26 U.S.C. § 7206, which prohibits the willful filing of false documents, and 26 U.S.C. § 7203, which prohibits the willful refusal to file a tax return if required to do so).

Moreover, the Sixth Circuit has more recently considered and rejected this same argument in a similar case. *See United States v. Anderson*, 353 F.3d 490, 498-500 (6th Cir. 2003) (superceded by statute on other grounds as recognized in *United States v. McBride,* 362 F.3d 360, 374 (6th Cir. 2004)). In *Anderson* the defendants filed numerous false Form 8300's reporting nonexistent transactions with judicial officers, police, and attorneys, and as a result, were convicted of violating § 7206(1). *Id.* at 497-98. In challenging their convictions, the defendants argued that the

government could not establish that the false information was material because the reported transactions never occurred, and, therefore, the defendants contended, they had no duty to file the forms. *Id.* at 499. The court rejected this argument, explaining that criminal penalties for perjury under § 7206 may apply to any document filed with the IRS. *Id.* (citing *United States v. Tarwater*, 308 F.3d 494, 504 (6th Cir. 2002)). The court further noted that the general definition of a materially false statement is a statement that "has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)). Consequently, the court concluded, "proof of a duty to file a return is not required to establish a violation of § 7206(1) or (2) for filing reports of nonexistent transactions." *Id.*; *see also United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1454 (9th Cir. 1986) ("Nothing in the statute or case law indicates that a charge under section 7206(1) for making and subscribing a false return is based on the taxpayer's duty to file or 'make' an income tax return."). Although Pansier relies on our statement in *United States v. Peters*, defining a material statement as one that "has the potential for hindering the IRS's efforts to monitor and verify the tax liability" of the taxpayer, 153 F.3d at 461 (internal quotations omitted), that definition specifically pertains to a false statement made within the context of a tax return, *see, e.g., Presbitero*, 569 F.3d at 700-01. Section 7206(1), however, encompasses "any return, statement, or other document." We therefore agree with the reasoning of the Sixth Circuit and con-

clude that a statutory or regulatory duty to file the form is not required to show materiality, nor is it a necessary element of an offense under § 7206(1).

The indictment here charged that Pansier "willfully made and subscribed false Forms 8300, 'Report of Cash Payments over $10,000 Received in a Trade or Business,' each of which contained a written declaration that it was signed under the penalties of perjury and none of which the defendant believed to be true and correct as to every material matter." The indictment, then, stated all the necessary elements of a charge under § 7206(1). *See Anderson*, 353 F.3d at 499; *Scholl*, 166 F.3d at 979. And the evidence presented at trial established that Pansier signed and filed, under penalty of perjury, the Form 8300's, reporting transactions that he knew to be false, and that false information led the IRS to initiate investigations into the reported transactions. This was sufficient evidence of materiality, *see Neder*, 527 U.S. at 16; *Anderson*, 353 F.3d at 499, and sufficient evidence to sustain the convictions.

### D. The district court correctly applied *Daubert* and allowed the expert testimony.

Finally, Pansier challenges the admissibility of William Kerr's expert testimony, arguing that the district court did not properly consider the reliability of Kerr's testimony as required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). He further argues that Kerr was not qualified to testify about Treasury Direct accounts or the Uniform Commercial Code and

that his testimony about Treasury Direct account numbers was directly contradicted by that of Donna Ayers, an employee of the Bureau of Public Debt. Finally, Pansier argues that the court erred by allowing Kerr to testify as to ultimate issues involving a legal conclusion.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the framework established by the Supreme Court in *Daubert*. *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007). Rule 702 allows the admission of expert testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The district court, however, must act as the gatekeeper to ensure that the proffered testimony is both relevant and reliable. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Daubert*, 509 U.S. at 589; *Jenkins v. Bartlett*, 487 F.3d 482, 488-89 (7th Cir. 2007). To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive a particular conclusion. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). We give the court great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable, *Jenkins*, 487 F.3d at 489, but the court must provide more than just conclusory statements of admissibility to show that it adequately performed the *Daubert* analysis, *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006). We review de novo whether the court applied the legal framework required under Rule 702 and *Daubert*, and we review the court's decision

to admit or exclude expert testimony for abuse of discretion. *Kunz v. DeFelice*, 538 F.3d 667, 675 (7th Cir. 2008).

Here, Kerr's testimony established his qualifications as an expert in legitimate and fictitious financial instruments and banking. The district court responded to Pansier's objections as to the reliability of Kerr's opinions by directing the government to lay a foundation as to Kerr's analysis of the specific documents involved and only allowed Kerr's expert testimony after he specifically testified about his methods for ensuring the reliability of his analyses. The court, therefore, adequately performed the *Daubert* analysis.

Moreover, the fact that Kerr's testimony touched upon the Uniform Commercial Code and Treasury Direct accounts as a part of his overall analysis of the fictitious financial instruments did not render the testimony inadmissible. The district court properly permitted the testimony within the context of Kerr's analysis of the financial instruments and his expertise in banking. Likewise, any possible inconsistency with another witness's testimony about the numbers used to identify a Treasury Direct account does not mean that Kerr's testimony was unreliable. Although his testimony was that a Treasury Direct account is identified by the account-holder's social security number, while Ayers's testimony was that the accounts are identified with a unique account number but can be retrieved with a social security number, it was up to the jury to determine the import of any discrepancy as a factual matter. *See Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002); *Smith,* 215 F.3d at 718

("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").

Finally, an expert may testify about an ultimate issue to be decided by the jury but must refrain from giving "an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." Fed. R. Evid. 704; *see United States v. Chube II*, 538 F.3d 693, 700 (7th Cir. 2008); *United States v. Blount*, 502 F.3d 674, 679 (7th Cir. 2007). Here, Kerr testified as to the ultimate issues that the sight drafts were fictitious financial instruments and were purportedly drawn on a Treasury Direct account under the authority of the United States. *See* 18 U.S.C. § 514. He did not, however, testify as to Pansier's state of mind or his intent to defraud, and the district court, therefore, did not abuse its discretion in allowing the testimony. *See Blount*, 502 F.3d at 679-80.

## III. CONCLUSION

For the reasons discussed above, we AFFIRM the judgment of the district court.